# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **APOLLO METALS, LTD,** | : | **CIVIL ACTION** |
| **Plaintiff** | : | |
| | : | |
| **v.** | : | **NO. 06-5245** |
| | : | |
| **ELECTROPLATING** | : | |
| **TECHNOLOGIES, LTD,** | : | |
| **Defendant** | : | |

## M E M O R A N D U M

**STENGEL, J.**                                                    **November 23, 2009**

Apollo Metals filed a complaint in this court seeking a fourfold declaratory judgment that (1) it had not breached an agreement it made with Electroplating Technologies; (2) it had not misappropriated certain proprietary information or trade secrets belonging to Electroplating Technologies; (3) Electroplating Technologies' patents were not infringed; and (4) Electroplating Technologies' patents were invalid and/or unenforceable. The defendant responded with several counterclaims against the plaintiff.

The defendant now moves for the dismissal of all claims and counterclaims here, so that the parties may initiate binding arbitration pursuant to a Patent, Technical Information and Technical Assistance Agreement ("Agreement") between the parties. To that end, the defendant has incorporated into its motion a covenant not to sue. For the following reasons, I will grant the motion to dismiss and compel arbitration.

## I. BACKGROUND

The defendant is the owner of proprietary information and the Patents-in-Suits,[1] each of which concern various metal coating and surface treating technologies, such as brush plating, anodizing, and electroplating. Compl. ¶ 7. On November 1, 1995, the parties entered into the Agreement for the plaintiff to license exclusively the right to use and practice certain proprietary information and patents related to brass, copper, nickel, and nickel-chromium plating for the manufacture, use, and sale of certain products. Id. ¶ 8. The parties have since executed several amendments to this Agreement which included converting the exclusive license into a non-exclusive license. Id. The Agreement includes an arbitration clause, which has not been altered by these amendments.

On July 29, 2006, the plaintiff sent the defendant a letter consistent with the terms of the Agreement providing six months notice of its intent to terminate the Agreement regarding the defendant's non-brass plating technologies. The plaintiff was no longer using the defendant's licensed technology on those lines. Compl. ¶ 9. A month later, the defendant sent the plaintiff a letter accusing the plaintiff of improperly using the patents and proprietary information, but did not specifically identify which patents or what information. The letter also accused the plaintiff of breaching the Agreement and

_____

[1] These Patents-in-Suit comprise U.S. Patent Numbers: 5,277,785; 5,453,174; 5,462,649; 5,476,578; 5,679,233; 5,837,120; 5,938,899; 6,149,781; 6,217,725; 6,322,673; 6,780,302; and 6,800,186. Compl. ¶ 7.

interfering with the defendant's business relations.  Id. ¶ 10.  The plaintiff denied the allegations in correspondence dated October 12, 2006.  Id. ¶ 11.  Two weeks later, the defendant reiterated the allegations and threatened to pursue all available remedies if left unresolved.  Id. ¶ 12.

Because of these threats and the plaintiff's resultant apprehension, the plaintiff brought suit here seeking a declaratory judgment, specifically, that: (1) it had not breached the Agreement; (2) it had not misappropriated trade secrets or proprietary information; (3) it had not infringed the defendant's patents; and (4) that the defendant's patents are invalid and/or unenforceable.  The defendant filed a counterclaim against the plaintiff which included several claims of:  infringement of patents, some of which were part of the Agreement and others were not; breach of the Agreement by the plaintiff; and fraudulent misrepresentation.  On two occasions, the defendant amended its counterclaim so that only the breach of contract claim remains.

As part of its motion to compel arbitration, the defendant made the following representations in what it refers to as a "Covenant Not To Sue:"

(1) The defendant will not sue the plaintiff on the basis of any of the Patents-in-Suit, as defined in the plaintiff's complaint, for any infringing acts taking place on or before the date of this motion;

(2) The defendant will not sue the plaintiff on the basis of any of the Patents-in-Suit for any acts that involve apparatuses or processes that were used by the plaintiff in its Bethlehem, Pennsylvania facility on or before the date of this motion;

(3) The defendant does not contend that the plaintiff's X19 or X23

electroplating lines, as presently configured, appropriate technology that is within the scope of any of the claims of the Patents-in-Suit.

## II. DISCUSSION

### A. Plaintiff's Counts III and IV

Count III seeks a declaration that the plaintiff has not directly infringed, induced the infringement of, or been a contributory infringer of any claim of the Patents-in-Suit. Compl. ¶ 23. Count IV seeks a declaration that the Patents-in-Suit are invalid and/or unenforceable for failure to comply with the requirements of Part II of Title 25 of the United States Code. Id. ¶ 25. For the following reasons, the defendant's covenant not to sue divests the court of jurisdiction over these claims.

An actual controversy must exist at all stages of a declaratory judgment action, not merely at the time the complaint is filed. Preiser v. Newkirk, 422 U.S. 395, 401 (1975). A covenant not to sue for any infringing acts that predate the filing date of the action divests the court of jurisdiction over claims relating to infringement and validity of patents that are within the scope of the covenant not to sue, provided that the covenant not to sue predates any consideration or resolution of the underlying patent infringement claim. Super Sack Mfg. Corp. v. Chase Packaging Corp., 57 F.3d 1054, 1058 (Fed. Cir. 1995); Amana Refrigeration, Inc. v. Quadlux, Inc., 172 F.3d 852, 855 (Fed. Cir. 1999), Fort James Corp. v. Solo Cup Company, 412 F.3d 1340, 1348 (Fed. Cir. 2005). A statement of counsel in motion papers regarding a covenant not to sue is sufficient to make the covenant binding. Super Sack, 57 F.3d at 1059. The covenant need only

4

release the accused infringer from liability based on its past and present activities.
Amana, 172 F.3d at 855-856 (actual controversy cannot be based on a fear of litigation over future products) (citing Super Sack, 57 F.3d at 1060).

Here, the defendant has covenanted that it will not assert any of the Patents-in-Suit against the plaintiff for the plaintiff's past or present activities. So far, there has been no consideration or resolution of the alleged infringement. Thus, an actual controversy no longer exists between the parties regarding the infringement or validity of the defendant's patents. In its response to the motion, the plaintiff concedes that this covenant and the defendant's admission of no infringement by the plaintiff are sufficient to deprive the court of subject matter jurisdiction over these claims. See Pl.'s Br. in Opp'n at 17-18. Accordingly, because the defendant's covenant deprives the court of jurisdiction, I will dismiss Counts III and IV of the plaintiff's complaint. Super Sack, 57 F.3d at 1058.

### B. Remaining Claims and Counterclaim

The defendant argues that its sole remaining counterclaim and the plaintiff's two remaining claims are the only ones for which an actual controversy exists, that those claims are disputes arising under the Agreement, that they fall within the scope of the Agreement's Arbitration Clause, and that those claims should thus be sent to arbitration. I agree.

Arbitration is a creature of contract law. E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S., 269 F.3d 187, 195 (3d Cir. 2001). As such,

"it is a way to resolve those disputes, but only those disputes, that the parties have agreed to submit to arbitration, First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 943 (1995), and "a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit," AT&T Technologies, Inc. v. Communications Workers of America, 475 U.S. 643, 648 (1986). Accordingly, whether a party is bound to arbitrate is a matter to be determined by the court on the basis of the contract entered into by the parties. Id. at 649 (quoting John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 547 (1964)).

The Federal Arbitration Act provides that agreements to resolve disputes by arbitration "shall be valid, irrevocable and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2; see Harris v. Green Tree Financial Corp., 183 F.3d 173, 178 (3d Cir. 1999) (the Federal Arbitration Act "makes arbitration agreements enforceable to the same extent as other contracts"). The Supreme Court has acknowledged that the arbitrability of a particular dispute is to be determined with a "healthy regard for the federal policy favoring arbitration." Moses H. Cone Mem'l Hosp. v. Mercury Constr., 460 U.S. 1, 24-25 (1983). Accordingly, "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Id.

As the parties recognize, Pennsylvania contract law applies in this case. See Def.'s Ex. M at ¶ 15.02. It is well-settled in Pennsylvania that where a party to a civil action

seeks to compel arbitration, a court must employ a two-part test to determine if arbitration is required. Keystone Technology Group, Inc. v. Kerr Group, Inc., 824 A.2d 1223, 1227 (Pa.Super. 2003). First, it must be determined whether a valid agreement to arbitrate exists. Id. Second, if such an agreement does exist, it must be determined if the dispute involved is within the scope of the arbitration provision. Id. The scope of the arbitration is determined by the intention of the parties as ascertained in accordance with the rules governing contracts generally. Id. There must be a meeting of the minds in order for there to be a valid contract to arbitrate. Quiles v. Financial Exchange Co., 879 A.2d 281, 285 (Pa.Super. 2005).

The Pennsylvania Supreme Court has held that an agreement to arbitrate must be "clear and unmistakable" and cannot arise "by implication." Id. at 161 (quoting Emmaus Mun. Auth. v. Eltz, 204 A.2d 926, 927 (Pa. 1964)). Thus, before a party to a lawsuit can be ordered to arbitrate, there should be an *express, unequivocal* agreement to that effect. Id. (emphasis in original) (citing Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., 636 F.2d 51, 54 (3d Cir. 1980)). Here, the Arbitration Clause in the Agreement states:

> **15.03** In the event of any dispute arising under this Agreement, the parties agree that they will attempt to find an amicable solution to such dispute and that they will negotiate in good faith. However, in the event that it appears that a dispute cannot be resolved by such negotiation then either of the parties hereto shall have the right to initiate arbitration proceedings for the resolution of the dispute, except as the dispute may relate to the validity of any of the Licensed Patents or the scope of their claims. Any such unresolved dispute shall be finally settled definitively pursuant to the

> appointment of one or more independent arbitrator(s)
> mutually selected by the Licensor and Licensee. The
> arbitration procedure shall be carried out in Pennsylvania.
> The arbitrator(s) shall have the powers of friendly referee(s)
> and shall apply Pennsylvania law to the arbitration
> proceedings. Pending the completion of any arbitration
> proceedings, payments shall continue to be made in
> accordance with the provisions of this Agreement, with
> appropriate subsequent adjustments to be made to comply
> with any award rendered by the arbitrator(s).

See Def.'s Ex. M at 35-36. This arbitration provision is written and executed by the parties. It clearly involves commerce, and mandates arbitration for "any dispute arising under" the Agreement, unless and only to the extent that such disputes "relate to the validity of any of the Licensed Patents or the scope of their claims." The clause represents an express, unequivocal agreement between the parties to arbitrate disputes arising under the Agreement. I also note that neither party has challenged the clause's validity. Accordingly, pursuant to 9 U.S.C. § 2, I find that a valid agreement to arbitrate exists between the parties.[2] Keystone Technology, 824 A.2d at 1227.

Next, in determining if the dispute involved is within the scope of the arbitration provision, the district court must be satisfied of the arbitrability of an issue pursuant to

---

[2] Title 9 of the United States Code, Section 2 provides, "A **written** provision in any maritime transaction or a ***contract evidencing a transaction involving commerce*** to settle by arbitration a controversy thereafter arising out of such contract or transaction, or the refusal to perform the whole or any part thereof, or an agreement in writing to submit to arbitration an ***existing controversy*** arising out of such a contract, transaction, or refusal, shall be valid, irrevocable, and enforceable, save upon such grounds as exist at law or in equity for the revocation of any contract." (Emphasis added).

Section 3 of the Act.[3]  The court must determine who has the primary power to decide

arbitrability in the case.  Generally, the "question of arbitrability . . . is undeniably an

issue for judicial determination."  <u>AT&T Techs.</u>, 475 U.S. at 649.  However, in <u>First</u>

<u>Options of Chicago, Inc. v. Kaplan</u>, the Supreme Court held that "the question 'who has

the primary power to decide arbitrability' turns upon what the parties agreed about that

matter."  514 U.S. 938, 943 (1995).  The Court then advised that when deciding whether

the parties agreed to arbitrate a certain matter, including arbitrability, courts generally

should apply ordinary state-law principles that govern the formation of contracts.  <u>Id.</u> at

944.  However, "[c]ourts should not assume that the parties agreed to arbitrate

arbitrability unless there is 'clear and unmistakable' evidence that they did so."  <u>Id.</u>

(quoting <u>AT&T Techs.</u>, 475 U.S. at 649).

    In this case, there is no evidence that the parties delegated the power to decide

arbitrability to an arbitrator, much less "clear and unmistakable" evidence.  The

Arbitration Clause is silent on this issue and neither party asserts that such delegation was

intended.  Accordingly, I find that the court has primary authority to determine whether

the non-patent issues in this suit fall within the scope of the Arbitration Clause.

---

[3]  Section 3 of the Act provides:  "If any suit or proceeding be brought in any of the courts
of the United States upon any issue referable to arbitration under an agreement in writing for
such arbitration, the court in which such suit is pending, ***upon being satisfied that the issue
involved in such suit or proceeding is referable to arbitration under such an agreement***, shall
on application of one of the parties stay the trial of the action until such arbitration has been had
in accordance with the terms of the agreement, providing the applicant for the stay is not in
default in proceeding with such arbitration."  9 U.S.C. § 3 (emphasis added).

Qualcomm, Inc. v. Nokia Corp., 466 F.3d 1366, 1370-71 (Fed. Cir. 2006).

Once the court decides, as here, that the question of arbitrability is for judicial determination, it undertakes an arbitrability inquiry in order to be satisfied that the issue involved is referable to arbitration.  AT&T Techs, 475 U.S. at 649.  In determining whether the remaining claims are within the scope of the arbitration provision, I will consider each in turn.

### 1.  Defendant's Counterclaim Count XIII

The Agreement provides that in the event of the plaintiff's early termination of the Agreement, the plaintiff "agrees to discontinue use of Technical Information[4] and furthermore agrees to cease practicing the claims of Licensed Patents at the time early termination of this Agreement takes place."  See Def.'s Ex. M at ¶ 13.02.  Counterclaim Count XIII acknowledges these obligations of the plaintiff, see Countercl. ¶ 6, but alleges, however, that the plaintiff has breached the Agreement by continuing to use Technical Information on its brass plating line and its non-brass plating lines after January 31, 2006, the date of termination.  Id. ¶¶ 8-9.

The Agreement also provides that the defendant "shall be permitted during the License Period upon written request to [the plaintiff] to send a reasonable number of its employees to visit and observe the production of Licensed Products on Licensee Lines in

_____

[4]  The Agreement specifies that Technical Information excludes information that "is, or becomes, generally available to the public by publication or otherwise after disclosure by Licensor to Licensee. . ."  See ¶ 1.05.  The defendant indicates that all of the Patents-in-Suit are generally available to the public by publication.

Licensee Facilities and to discuss such products and their production with [the plaintiff's] employees." See Def.'s Ex. M at ¶ 9.01. Counterclaim Count XIII further alleges that the plaintiff has breached that provision of the Agreement by refusing to allow site visits by representatives of the defendant or its prospective licensees who would seek to observe the plaintiff's production or negotiate sublicensing agreements. Id. ¶¶ 15, 16, 27, 28, 29.

All of these allegations form the basis of the defendant's request for a declaration that the plaintiff has breached the Agreement, and are therefore disputes "arising under" the Agreement. Moreover, I am satisfied that these disputes are within the scope of the arbitration provision. Accordingly, I will dismiss this counterclaim with prejudice and instruct the parties to initiate binding arbitration of Counterclaim Count XIII.

## 2. Plaintiff's Count I

In addition to the provisions discussed above, the Agreement provides that the plaintiff "shall pay to [the defendant] for the exclusive rights to the use of the Technical Information and the Licensed Patents for the manufacture of Licensed Products in the USA in accordance with the schedule of license fees and Royalty payments . . . in connection with each type of electroplated product of Licensed Products, which correlates to the top or exterior metal coating of such electroplated product." See Def.'s Ex. M at ¶ 6.01. Count I of the complaint seeks a declaration that the plaintiff is not using the defendant's technology on its non-brass plating lines in breach of the Agreement. Compl.

11

¶ 16.  The plaintiff insists that it continues to uphold and abide by the terms and

obligations of the Agreement including paying royalties for the licensed brass plating

technologies.  Id. ¶ 17.  This dispute clearly arises under the Agreement, and I am

satisfied that it is within the scope of the arbitration provision.  Accordingly, I will

dismiss it, and instruct the parties to initiate binding arbitration of Count I.

### 3.  Plaintiff's Count II

Count II of the complaint seeks a declaration that the plaintiff is not using, without

authorization, any non-brass plating technology identified as proprietary information of

the defendant, or as a trade secret of the defendant.  Compl. ¶¶ 19-20.  The plaintiff

argues that this claim embraces issues that fall outside of the Agreement.  I do not agree.

The disclosure of the defendant's trade secrets and proprietary information to the

plaintiff, and the plaintiff's use of the defendant's trade secrets and proprietary

information are both governed by the terms of the Agreement.  Article II of the

Agreement governs, *inter alia*, the defendant's disclosure of technical information to the

plaintiff during the life of the Agreement, and the corresponding rights and

responsibilities the parties owe each other.  See Def.'s Ex. M.  Article III of the

Agreement governs confidentiality, and mandates that "all such Technical Information

shall be received and treated by Licensee as secret and confidential," and that "in

consideration of Licensee disclosing Licensee Information to Licensor, that any and all

Licensee Information disclosed after the Effective Date shall be received and treated as

secret and confidential by Licensor." Id. ¶¶ 3.01, 3.02. Article XIII of the Agreement

provides that should the plaintiff terminate the Agreement early, it "agrees to discontinue

use of Technical Information and furthermore agrees to cease practicing the claims of

Licensed Patents at the time early termination of this Agreement takes place." Id. ¶

13.02. Contrary to the plaintiff's argument, the claims in Count II are not covered by the

exclusion to the Arbitration Clause. None of these issues relate to the validity of the

Patents-in-Suit or the scope of the their claims. Rather, Count II seeks a declaration that

the plaintiff is not using certain technology, i.e., the defendant's proprietary information

or trade secrets, without the defendant's authorization. This dispute arises under the

Agreement, and I am satisfied that it is within the scope of the arbitration provision.

Accordingly, I will dismiss it, and instruct the parties to initiate binding arbitration of

Count II.[5]

     An appropriate Order follows.

---

[5] The plaintiff argues that it is a "prevailing party" given the defendant's covenant not to sue, and therefore the court should retain jurisdiction over its request for attorney's fees. I do not agree. The dismissal of this case is not based on the merits of the case, but the enforcement of a contract between the parties to arbitrate. To be a prevailing party, one must "receive at least some relief on the merits," which alters the legal relationship of the parties. Rice Servs., Ltd. v. United States, 405 F.3d 1017, 1025 (Fed. Cir. 2005). Accordingly, I will deny the request to retain jurisdiction for the purposes of entertaining a request for attorney's fees.